Moncure, P.,
delivered the opinion of the court.
This is a writ of error to a judgment of the circuit court of the city of Richmond, rendered on the 30th da}' of July, 1874, in an action of covenant brought in said court by the Richmond and Petersburg Railroad Company, plaintiff, against R. B. Kasey, M. M. Kasey, R. H. Whitlock, Peter J. Crew, Silas L. Johnson and C. B. Lipscomb, defedants. The bond hears date on the — day ■of Rovember, 1870, is in the penalty of $3,500, and has a condition thereto annexed, reciting that the said R. B. Kasey had been appointed by the president and directors of the Richmond and Petersburg Railroad Company general ticket and freight agent of said company, and stipulating as follows, to-wit: “Row, if the said R. B. Kasey shall faithfully perform all the duties of the said office, and shall well, truly and faithfully account for all moneys or other valuable effects belonging to said company, or of which the said company may become the *220 carriers or warehouses, that may in any manner be entrusted to him, the said E. B. Kasey, during his continuin said office of general ticket and freight agent; any such money or other effects which may be injured, l°st or destroyed while in the custody or under the charge^ie sa^ -B- Kasey as aforesaid, to be regarded and held as so injured, lost or destroyed by his negligence an(f fait^ unless shown by him to have been injured, lost' or destroyed otherwise than by such negligence or fault,, then this obligation to be void, else to remain in fuU force and virtue.” A breach of the said condition was charged in the declaration.
On the 7th of Kovember, 1873, “ came the parties, bjr .their attorneys, and mutually agreed that it be referred to Lawson Eunnally, as a commissioner, to ascertain and report at as early a day as practicable, what amount, if any, is due from the defendants to the plaintiff' in this cause, with liberty to either party to except to said report, and to show cause against the same, which said exceptions are to be heard and determined by the judge of this court upon such evidence as may be reported by the commissioner, and may be offered by either party,” &c., “ and any exceptions to the report of said commissioner shall be filed five days before trial.”
The said commissioner returned a report to the said court, showing that in pursuance of the said order of' reference, “ after spending much time in examining the-books of the said railroad company, investigating the accounts between the parties, taking the depositions of sundry witnesses, and fully hearing the statements of the parties and their counsel,” he had come to a conclusion thereon, and was of opinion that “ the account between the parties should stand thus.” Then follows the said account, showing to be due thereon to the said company the sum of two thousand three hundred and nineteen *221 dollars and fifty-five cents, which should bear interest from the 1st day of April, 1873, till paid.
The depositions taken by the commissioner were turned with his report. ■
Four exceptions were taken by the defendants to the report of Commissioner Kunnally, and will be herein- ,. . ■ ■alter set out and commented on.
On the 30th day of July, 1874, came again the parties, by their attorneys, and the defendants pleaded “covenants performed.” and “ covenants not broken ”; to which the plaintiff replied generally, and put itself upon the country, and the said defendants likewise; and neither party demanding a jury, but agreeing that the whole matter of law and fact may be heard, and judgment .given by the court; and the court, upon consideration of ■the evidence adduced in this cause, and the report of Commissioner ISiunnally, filed herein on the 27th of June, 1874, and the testimony returned therewith, with the exceptions to said report, adjudged that the plaintiff recover against the defendant, Robert B. Kasey (the principal in the said bond), twenty-three hundred and nineteen dollars and fifty-five cents, with interest thereon from April 1st, 1873, until paid, and the costs; and that the defendants, M. Kasey, R. H. Whitlock, Peter J. Crew', Silas L. Johnson and C. B. Lipscomb (the sureties in the said bond), go thereof without day and recover against the plaintiff their costs by them about their defence therein expended.
To which said judgment in favor of the said five last named defendants (the sureties in said bond), the plaintiff excepted, and tendered his bill of exceptions, which was made a part of the record, and in which was certified all the evidence adduced on the trial of the cause.
The plaintiff applied to a judge of this court for a writ •of error to said judgment, which was accordingly awarded, and that is the case we now have to decide.
*222 The questions arising in this case are presented by the four exceptions taken by the defendants to Commissioner. Hunnally’s report, and were argued in the same order by counsel in their argument of the cause in this court. We will pursue the same order in considering and deciding-the said questions, and in doing so will state, substantially, so much of the evidence in the cause, and such authorities and cases as seem to be material to be stated-
The first exception is as follows:
“1. The items charged to him (R. 13. Kasey) for tickets, and freight after his discharge. These items are charged between tbe 3d and 10th of March. He was discharged on the 3d of that month. It is clear that the charge is-illegal. The plaintiff endeavors to get over the difficulty by trying to prove that corresponding credits are given • but the witness fails to point out the credits. He merely says credits were given, but cannot designate the credits; they were embraced in tbe general credits. This confuses the accounts, so that its accuracy cannot be tested-The sureties should therefore be discharged.”
We think the items of charge above referred to are good charges, as well against the sureties as the principal, and are warranted by the report of Commissioner Hunnally and by the evidence of M. S. Yarrington, the treasurer of the company. In the said report, after charging the defendants with $1,263.45 for freights collected between the 3d and 10th of March, 1873 (the said R. B. Kasey having ceased to be the agent of the company on the 3d of March, 1873), the commissioner thus proceeds: “ This commissioner has given much thought to these charges; but when he considered that more than $2,400 has been collected by the company and'credited Kasey after he left the employment of said company, and the testimony of M. S. Yarrington, the treasurer, he saw no objection to such charges being made, more particu *223 larly when corresponding credits were given therefor, and he has therefore allowed them.”
And in the deposition of said Yarrington, taken the commissioner on the 20th of June, 1874, in answer to the second question by commissioner, the witness says: “After Kasey left the employment of the company, we determined to fix some period of time to which to charge him, and fixed the 10th of March, 1873, and the bills uncollected by him and left in his office were collected by his clerks and other employees of the company, and as they made such collections and handed over the money, Kasey was credited with the same, as may be seen by the account, such credits amounting to more than $2,400, and the charges to only $1,263.45.”
It thus appears, not only that these áre proper charges against the principal and sureties, but that no loss, in any event, could have been sustained by either of them from making them.
The second exception is as follows:
“ 2. The uncollected bills should be credited to Kasey. The company knew that he was giving credit for freights, and thus sanctioned’ and approved it, and therefore should bear the loss; it should not fall on his innocent securities. When they signed his bond the rule of the company was that no credit for freight should be given. This formed a part of their contract with the company. It was practically incorporated into the bond, and they were protected from this risk; the company changed the rule by allowing credits for freights to be given, and thus increased the risk, and should bear the loss. The securities were not informed of this change, and hence had no means of protecting themselves, and upon eveiy principle, of law and equity are discharged from the loss that was paused by this change in the rule of the company.”
The company did not sanction or approve Kasey’s *224 giving credit for freights, nor did the president or treasurer of the company. The president of the company, H. "Wynne, in answer to the third question propounded to him on his cross-examination, viz: “Did you know Kasey was in the habit of delivering articles without PaJmenf °f freights?” says: “Yes, sir, andT knew he did it at his own risk and hazard as regards the freights.” And in answer to the fourth question, “Did you interfere to prevent it ? ” he says: “ I frequently remonstrated with him in regard to the risk which he was assuming, when I thought it was a very doubtful matter in regard to his collecting the freight, and he replied that he could trust the parties, and was willing to risk it.” And in answer to the ñfth question, “Did you speak to him in regard to particular persons, or as to the particular practice ? ” he says: “ I spoke to him as to both, but more particularly in regard to parties I would not have trusted.”
It does not appear that when the sureties signed the bond it was the rule of the company that no credit for freights should be given, nor that there was any change of the rule of the company on this subject after they signed the bond and while their principal was agent of the company. In answer to a question propounded to the witness; Yarrington, on his cross-examination, he says: “ The rule of the company requires that he (the ticket and freight agent) should settle his account for the preceding month by the 5th of each month; Kasey never complied with this rule, and was in arrear on each successive month; on the 23d of December, 1872, he made a payment which closed the account for the month of November, and on the 1st of January, 1873, he was in arrears, as shown in Account A.” And in answer to other questions propounded to the same witness on his cross-examination, he further says as follows: '
*225 “ Thirty-seventh question. When did you first become aware that Kasey was in default to the company ?
“Answer. I think it was about twelve or eighteen months before he left; I knew that in the first month he did not settle until four days after the time allowed by the fules, and he continued so for each successive month until he left; his indebtedness increased nearly every month.
“ Thirty-eighth question. Did you inform the president nr directors of this fact ?
“Answer. Yes, sir; I did.
“Thirty-ninth question. Were the securities of Kasey informed of it ?
“Answer. Yes, sir; I cannot say when.
“Fortieth question. You have spoken of accounts rendered to you by Kasey; did you find those accounts generally correct ?
“Answer. Ko, sir; and sometimes I found errors which I corrected; it was frequently the case—almost every month.”
It does not appear .that the company ever changed its rules in regard to the time for paying for tickets and freight. On the contrary, it appears that no such change was made while Kasey was agent for the company. But it would have been competent for the company to have made such change without impairing the liability of any of the obligors to the bond, principal or sureties. It is well settled, as we will presently see, that the rules and regulations existing at the time of the execution of such a bond do not become terms and conditions thereof, unless such an intention be expressed on the face of the bond.
We are therefore of opinion that the second exception is unsustainable.
*226 The third exception is as follows:
“ 3. The default occurred in the first month, and was with the knowledge of the company, each month until it reached the amount of the penalty of the bond. bT° information of this default was given to the sure^es’ an<^ they had no opportunity of protecting themselves. It was the duty of the company to have dis-°barged him at the end of the first month. Every subsequent defalcation was with the knowledge and concurrence of the company, and they should bear the loss. It was their duty to the securities to discharge him, and was a part of the contract itself. To allow the defalcation to increase monthly until it reached the penalty of the bond, was not only a breach of the contract, which required that he should be discharged when the first default was known, but it was a fraud on the securities, and vitiates the whole claim.”
The default did not reach the amount of the penalty of the bond, as stated in the third exception. Information of the default was given to the sureties by Yarrington, though he could not say when; and Wynne says that he did not inform the sureties of Kasey of the condition of his accounts until he admitted that he was behindhand; which seems to imply that he did then so inform them. On being asked, “When did you first become aware' that Kasey was in arrears ? ” Wynne answered, “About a year before he left, I was informed by Mr. Yarrington that he was in arrear; but he said he could settle at any time, and would take the receipts of the succeeding month to settle for the preceding one, and would so settle.” If any defalcation of Kasey was with the knowledge of the company, certainly there was none with its concurrence, or that of its president, treasurer or auditor.
Certainly there was no fraud nor connivance on the part of the company, or of its president, treasurer or *227 ••auditor in any transaction with Ilasev in regard to his ° “ ° •agency aforesaid for the company. The said president and treasurer seem to have acted in that regard with ■eye solely to the interest of the company, which was at the same time the interest of the sureties. If they refrained for any time from removing him from office, or otherwise proceeding against him, it was only with the hope of enabling and inducing him to pay what he •owed in exoneration of his sureties. It does not appear and is not pretended that the company entered into any contract or had any understanding with Kasey wdiich had the effect of tieing its hands for a moment and preventing it from enforcing the obligation of himself and his sureties, or removing him from office whenever it might be its pleasure to do so; nor that the company •ever released any lien which it may have had (but m fact it had none) for the security of said bond or the indemnity of the said sureties. It does not appear that the said president or treasurer had any acquaintance, •certainly the company itself could have had none, with the said Kasey at the time he was received in its employment. The sureties, on the other hand, no doubt knew him well and were his friends. They had confidence in him, and were willing to join him in the bond; and by ■offering to do so, and actually doing so, they enabled him to obtain the agency aforesaid. They ought to have looked to their interest and made enquiries and taken •care of themselves in the matter, instead of waiting for two or three years, until their principal ivas turned out ■of office and a demand ivas asserted against him for his default therein, and then setting up as a defence for themselves the ground that their, principal had not been ■compelled by the company to settle his accounts with it more promptly.
We are of opinion that the third exception is unsustainable, and that-it will so fully appear from the authorities *228 to which we will l’efer, after noticing the next and last exception, which is as follows:
“4. The dealings with Garber, charging Kasey with the money received from Garber. This was no part of his contract. He was general ticket and freight agent to sell tickets and receive money and to collect freights. He had nothing to do with Garber. He did not place-the tickets in his hands, nor did he receive the money from him. That he is charged with all the tickets sold by Garber, is admitted and proved. And the only proof that he has been credited is a sweeping and general assertion to that effect; no item of credit can be pointed out. But it is said that these credits are embraced in and formed a part of other credits, which items, and what proportions of each item, the witness is unable to state. This commingling of debts and credits, which properly form no part of the accounts, is sufficient to-vitiate the claim. But there is a more fatal objection. It increases the risk of the principal contractor without the consent of the sureties, and that discharges them; for it.is a well-settled principle that any act of the party with whom the contract is made, which increases the risk of the promiser without the consent of his sureties* vacates the promise as to them. The period of the tenure of his office was indefinite, with power in the company to dismiss; and this they were bound to exercise with due regard to the interest of the securities.”
The matter of this exception is fully explained in the deposition of Yarrington, taken June 20th, 1874, in the following question and answer:
“Third question by commissioner. Many enquiries have been made of you in regard to tickets delivered to Mr. Garber for sale and charged against Kasey; please explain more fully how this was ?
“ Answer. Mr. Garber was engaged in the business of transporting passengers and their baggage from one *229 depot to another, and those leaving the city from their residences to said depots, and an arrangement was made with him for the sale of tickets by the president of •company for the purpose of facilitating passengers, and •only the tickets actually sold by said Garber were charged to Easey, and I am fully satisfied that every ticket sold by Garber has been accounted for by him and Easey credited for the same; and upon reflection, since my deposition was given a few weeks ago, I am satisfied Easey knew of the arrangement, for he was in the habit of receiving Garber’s checks for the money and depositing them in bank to the credit of the company.”
We think that the sureties sustained no injury from the transactions referred to in the fourth exception, and that the said exception is therefore unsustainable.
Easey’s office was that of general ticket and freight agent. That Garber was employed by the company to lielp him to sell tickets certainly did not injure him or his sureties if they sustained no loss, as they certainly did not, on his account. The whole account of such agency, including that of Garber, was kept in Easey’s name, because the company wished to have but one such agent. But this was done with the consent of Easey, and his sureties can make no valid objection on that account. Easey no doubt, from necessity, had several assistants in the execution of his agency. That Easey might possibly have sustained loss from the default of Garber, which he did not in fact sustain, can be no good .ground for releasing the sureties.
Having expressed our views on all the questions arising in the case, we will now notice the authorities which have been referred to, or many of them, some of which we think fully sustain those views, while none seem to be in conflict therewith.
They are: United States v. Kirkpatrick, 9 Wheat. R. 720 ; Same v. Vanzant, 11 Id. 184; Same v. Nicholl, 12 Id. 505;. *230 Dox, &c. v. Postmaster-General, 1 Pet. 318; Jones v. United States, 18 Wall. U. S. R. 662; The People v. Jansen &c., 7 John. R. 331; The People v. Russell, 4 Wend. R. 570; Albany Dutch Church v. Vedder, &c., 14 Wend. R. 165; Board of Supervisors v. Otis, &c., 62 New York R. 88; Atlantic & Pacific Tel. Co. v. Barnes & al., 64 Id. 385; The Commonwealth v. Brice, 22 Penn. St. R. 211; Pittsburg, &c., Railway Co. v. Shæffer, 59 Id. 350; 2 J. J. Mar. 564, Taylor v. Bank of Ky.; The Trent Navigation Co. v. Harley, 10 East. R. 34; Burgess v. Eve, 13 Law Rep., equity cases, 450; Phillips v. Foxall, 7 Law Rep. Court of Q. B. 666; Sanderson v. Aston, 8 Id. Court of Exchequer, 73; Holmes v. Commonwealth, 25 Gratt. 771.
In The People v. Jansen, &c., supra, decided in 1811, in an action brought against a surety on a bond given for the faithful discharge of the duty of a loan officer under the act therein mentioned, it was held that the surety might set up in his defence the laches of the supervisors in not discharging and prosecuting the loan officer for his first default, but suffering him to continue after repeated defaults for upwards of ten years, when the loan officer became insolvent, and without prosecuting the officer as required by the act, and where no notice was taken of the defaults of the principal until after the death of the surety, this laches of the supervisors was held to be a good defence, especially in a suit againt the heirs of the surety. The facts of that case were decidedly more favorable to the surety than those of this, yet that case has since been disapproved and overruled. See 9 Wheat. R. 720; 4 Wend. R. 570; 14 Wend. R. 166, 170, 171;, 62 N. Y. R. 95, supra.
In Albany Butch Church v. Vedder, &c., supra, decided1 in 1835, in which the unanimous opinion of the court was delivered by Savage, C. J., it was held that “the sureties had no reason to place any reliance upon the *231 by-law requiring the treasurer to account every six “ i o ... months; that was a mere private regulation which did not form any part of the contract with the sureties.”
In Board of Supervisors v. Otis, &c., supra, decided in 1875, it was unanimously held by the court of appeals of New York (Church, C. J., not sitting,) that “ the sureties upon the official bond of the county treasurer are not discharged from their obligation by any neglect, omission of duty, unfaithfulness, or malfeasance on the part of the'board of supervisors in their dealings with the principal in the bond. . The board of supervisors and the county treasurer are alike agents of the county, and the acts or neglects of one agent cannot affect the liability of another, or of his sureties to the common principal.”
In The Pittsburg, &c., Railway Co. v. Shæffer & al., supra, decided in 1869, the rules of a railway company required from the cashier monthly reports and payments; the bond of the cashier and his sureties was conditioned that he should faithfully discharge his duties as required by the rules, a copy of which he acknowledged to have received; the cashier neglected to account and pay over for six months, when he was dismissed, and the sureties were not notified of his default for three months after-wards. It was held that they were not discharged. The unanimous opinion of the court in the case was delivered by Sharswood, J., who, after making a quotation from the opinion of Story, J., in the case cited, supra, from 9 Wheat. 720, proceeded thus: “The reasons so clearly stated by Story, J., in regard to officers of government, apply with equal force to officers of corporations. Corporations can act only by officers and agents. They do not guarantee to sureties of one officer the fidelity of the others. The rules and regulations which they may establish in regard to periodical returns and payments are for their own security, and not for the benefit of the sureties. The sureties by executing the bond became re *232 .pousible for the fidelity of their principal. It is no collateral engagement into which they enter dependent on contingency or condition different from the engagement of their principal. They become joint obligors w^h same bond, and with the same condition underwritten. The fact that there were other unfaithful officers and agents of the corporation who knew and connived at his infidelity, ought not, in reason, and does not in law or equity, relieve them from their responsibility for him. They undertake that he shall be honest though all around him are rogues. "Were the rule different, by a conspiracy between the officers of a bank or other moneyed institution, all their sureties might be discharged. It is impossible that a doctrine leading to such consequences can be sound. In a suit by a bank against a surety on the cashier’s bond, a plea that the cashier’s defalcation was known to and connived at by the officers of the bank, was held to be no defence. Taylor v. Bank of Kentucky, 2 J. J. Marsh. 564.”
What was said by Judge Robertson, who delivered the opinion of the court in the case last referred to, is very appropriate to this case, but need not be here repeated.
In Phillips v. Foxall, supra, decided in 1872, a case very much relied on by the counsel for the defendants in error in their argument of this case, it was held that on a continuing guarantee for the honesty of a servant, if the master discovers that the servant has been guilty of dishonesty in'the course of the service, and instead of dismissing the servant, he chooses to continue him in his employ without the knowledge and consent of the surety, express or implied, he cannot afterwards have recourse to the surety to make good any loss which may arise from the dishonesty of the servant during the subsequent service. The ground for the relief of the sureties in that case was, that the servant, in the course of his service, was guilty of a fraud, which came to the *233 knowledge of the master, and for which he might, and in justice to the surety, ought to have dismissed the serwant; but instead of doing so, he concealed the from the surety, and continued to employ the servant thereafter. Under these circumstances it was held that the surety was not liable for any default of the servant «/ « committed thereafter in the course of his employment. That such was the ground of that decision is further shown by the dictum of Sir R. Malins, V. C., in Burgess v. Eve, 13 Law Rep. Equity Cases, 450, decided about the same time, which dictum was quoted and relied on by the judges of the court of queen’s bench in Phillips v. Foxall, supra; and is further shown by the case of Atlantic & Pacific Tel. Co. v. Barnes, &c. supra, decided by the court of appeals of New York in 1876. It is true that in the case of Sanderson v. Astor, supra, decided by the court of exchequer in 1873, one of the barons, Kelly, C. B., in his opinion, does say that “ the case of Phillips v. Foxall clearly shows that if any defaults or breaches of duty, whether by dishonesty or not, have been committed by the employed against the employer, uuder such circumstances that the employer might have dismissed the employed, the surety is entitled to call on the employer to dismiss him. But none of the other judges in that case use any such expression, and the meaning of the judges in the former case seems to be plain enough, and to be correctly expounded by the court of appeals of New York as aforesaid.
But in the case under consideration there was certainly no fraud nor misconduct on the part of the president or treasurer, or any other officers of the Richmond and Petersburg Railroad Company, much less on the part of the company itself, in the dealings aforesaid with R. B. Kasey, and there is no ground on which his sureties *234 are entitled to be discharged according to any of the cases referred to.
¥e are therefore of opinion that the judgment of the circuit court in favor of the said sureties is erroneous and ought to be reversed and annulled, and in lieu thereof a judgement rendered, as well against the said sureties as the principal debtor, for the sum of $2,319.55,. with interest thereon from April 1st, 1873, and costs.
The judgment ivas as follows:
The court is of opinion, for reasons stated in writing and filed wfith the record, that the said circuit court erred in rendering judgment in favor of the sureties of Robert B. Kasey, against the plaintiff, and in not rendering judgment as well against the said sureties as the said principal for the sum of money and interest ascertained to be due by him to the plaintiff by the report of Commissioner Kunnally, and the costs of the plaintiff' in the action. Therefore it is considered that so much of the said judgment as is above declared to be erroneous, be reversed and annulled, and that the defendants in error, the said sureties, M. M. Kasey, R. H. Whitlock, Peter J. Crew, Silas L. Johnson and C. B. Lipscomb, pay to the plaintiff in error, the Richmond and Petersburg Railroad Company, its costs by it expended in the prosecution of its writ of error aforesaid here. And this court, proceeding to render such judgment as the saidi circuit court ought to have rendered, in lieu of so much of the said judgment of the said circuit court as is above declared to be erroneous and reversed and annulled, it is further considered by the court that the plaintiff recover against all the defendants, principal and sureties, to-wit: the said Robert B. Kasey, M. M. Kasey, R. H. Whit-lock, Peter J. Crew, Silas L. Johnson, and C. B. Lipscomb, twenty-three hundred and nineteen dollars and *235 fifty-five cents, with interest thereon from April 1st, 1878, until paid, and the costs by the said plaintiff expended in the prosecution of this action in the said circuit court.
Which is ordered to be certified to the said circuit court of the city of .Richmond.
Judgment reversed.